J-S31031-21

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37**

| | | |
|---|---|---|
| IN THE INTEREST OF: L.F. | : | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| | : | |
| APPEAL OF: R.F., FATHER | : | |
| | : | |
| | : | |
| | : | |
| | : | |
| | : | |
| | : | No. 938 EDA 2021 |

Appeal from the Order Entered May 11, 2021
In the Court of Common Pleas of Philadelphia County Juvenile Division at
No(s):  CP-51-DP-0002071-2016

BEFORE:  STABILE, J., KING, J., and PELLEGRINI, J.[*]

MEMORANDUM BY PELLEGRINI, J.:                    **FILED NOVEMBER 01, 2021**

R.F. (Father) appeals from the order of the Court of Common Pleas of Philadelphia County (trial court) granting the petition of the Philadelphia Department of Human Services (DHS) to terminate court supervision and change the permanency goal of L.F. (Child) (d.o.b. 3/13) to Subsidized Permanent Legal Custody (PLC) with his foster parent.[1]  We affirm.

We glean the following pertinent factual background and procedural history from our independent review of the certified record and the trial court's June 24, 2021 opinion.

_____

[*] Retired Senior Judge assigned to the Superior Court.

[1] D.F. (Mother) agreed with the goal change and is not a party to this appeal. (**See** N.T. PLC Hearing, 5/11/21, at 24).

**I.**

**A.**

Child's family has been involved with DHS since 2005 due to Mother's history of substance abuse, mental health issues, child neglect, child corporal punishment, lack of supervision, prostitution, unstable housing, homelessness and truancy. In March 2013, approximately eight years later, Child was born. (**See** Trial Court Opinion, 6/24/21, at 1-2) (citing Petition for Goal Change to Permanent Legal Custody, 3/02/21, at Exhibit A, Statement of Facts, Paragraph a).

DHS's involvement with Child began on July 5, 2016, when it received a General Protective Services (GPS) report alleging that Child and his siblings, G.F., A.F. and E.F., were living with P.W., their maternal grandmother (Maternal Grandmother), after Mother left them in her care and her whereabouts became unknown. Mother had a Single Case Plan (SCP) and had been receiving in-home services. The report maintained that Father resided outside of Pennsylvania. The report was substantiated. (**See id.** at 3) (citing Statement of Facts, at Paragraph e).

On July 8, 2016, DHS's attempt to contact Maternal Grandmother was unsuccessful, and their maternal aunt, P.F. (Maternal Aunt), who had been caring for Child's sibling, A.F., since June 18, 2016, stated that the whereabouts of Child and his other siblings had been unknown since June 30, 2016. DHS contacted Maternal Aunt again and learned she had begun caring

for Child on August 17, 2016.[2]   When DHS visited on August 17, 2016,

Maternal Aunt stated that Child had decayed teeth, was not toilet trained and

had a speech delay.   Mother's whereabouts remained unknown, as did the

location of Child's, G.F.'s and E.F.'s fathers.   A.F.'s father was reportedly

deceased.   (*See id.* at 4-5) (citing Statement of Facts, at Paragraphs g, h, j-

m).

On September 21, 2016, DHS filed a dependency petition and the court

appointed Angelina Louise Dagher, Esquire, as Child Advocate to represent

the legal interests of Child.   On September 22, 2016, Child was adjudicated

dependent,[3] committed to the care and custody of DHS and placed in kinship

care with P.F.   The Community Umbrella Agency (CUA) Associacion De

Puertorriquenos En Marcha (APM) was directed to refer Child to early

intervention services.   (*See id.* at 5-6) (citing Order of Adjudication and

Disposition, 9/22/16);[4] (*see also* Statement of Facts, at Paragraph n).

At a December 14, 2016 permanency review hearing, R.F. was identified

as Child's Father and was ordered to have supervised visits with Child at DHS

_____

[2] She also was caring for Child's brother, G.F., as of August 9, 2016.

[3] Child's siblings G.F. and A.F. were also adjudicated dependent on September 22, 2016.

[4] The court signed all the master's recommendations, making them orders of court.   Hence, where we note that the court ordered anything as the result of a review hearing, it is at the master's recommendation after observing the parties and receiving evidence.

as part of the Family Service Plan (FSP). On January 25, 2017, a permanency review hearing was held for Child, and Father was ordered to sign consents for Child to be evaluated for speech therapy services. Child continued to reside in kinship care and the court ordered that he remain committed to DHS's legal custody. Father was permitted unsupervised visits with Child after a home evaluation was performed and ordered to sign consents for Child to receive a speech therapy evaluation. (*See* Trial Ct. Op., at 7-8) (citing Master's Recommendation-Continuance, 12/14/16; Master's Recommendation-Permanency Review, 1/25/17).

After the April 5, 2017 permanency review hearing, the court ordered Father to have unsupervised, overnight visits with Child and visitation may be modified up to and including reunification with Father prior to the next court date by agreement of the parties. Child was found to be up to date with medical and dental care. DHS was directed that it may submit an administrative order to discharge the commitment and implement supervision and to develop a child-care plan. (*See id.* at 8) (citing Master's Recommendation-Permanency Review Order, 4/05/17).

On August 10, 2017, the CUA revised the SCP and changed Child's alternate/concurrent goal to PLC. Child's goal remained PLC throughout the ensuing four years. (*See id.* at 8-13); (citing Statement of Facts at Paragraphs aa, cc, ee, hh, kk, mm, pp, rr).

The master held a permanency review hearing on September 27, 2017, after which legal custody remained with DHS and placement continued with Foster Care (kinship). Father was found to be moderately compliant with his objectives and he was ordered to report to the CEU forthwith for a drug and alcohol screen, substance abuse assessment, monitoring and three random drug screens before the next court date. Father was ordered to comply with all services and recommendations and to provide employment verification to the CUA, which was to refer him to the ARC program for housing. The court also directed bi-weekly supervised visitation with Child and Father. (*See* Trial Ct. Op. 9) (citing Master's Recommendation-Permanency Review Order, 9/27/17).

At a December 21, 2017 status review hearing, Father was referred to ARC for parenting, housing, employment and to CUA to explore if Father had any drug and alcohol or mental health needs. (*See id.*) (citing Status Review Order, 12/21/17).

On February 10, 2018, Child and his brother, G.F., were placed in the foster home of A.W. and K.W., where they continue to reside. (*See* N.T. PLC Hearing, 5/11/21, at 15).

Over the course of the permanency review hearings between March 9, 2018, and October 9, 2020, Father's FSP goals for reunification included to continue mental health and drug and alcohol treatment, to provide copies of his treatment plan and progress reports from JFK Behavioral Health Systems,

to have liberal, unsupervised visits with Child, to report to CEU for monitoring, to have a PLS conducted, to re-engage in parenting, to provide proof of employment to the CUA and to obtain housing. Father was found to be in substantial compliance with the permanency plan in April, June and December 2019; he was found to be in moderate compliance with the permanency plan in 2018 and on October 9, 2020. Child's medical, dental and vision remained up to date and his education needs were being addressed. (*See* Trial Ct. Op., at 9-13) (citing Recommendation-Permanency Review Orders, 3/09/18, 5/31/18, 8/21/18, 1/17/19, 4/09/19, 6/20/19, 12/12/19, 3/04/20, and 10/09/20; Statement of Facts, at Paragraphs ll, nn, oo).

**B.**

On March 2, 2021, DHS filed a Petition for Goal Change in which it sought to grant PLC to A.W. It maintained that Child had been residing with A.W. and K.W. since February 10, 2018, and that reunification was no longer a viable option because Mother and Father had:

> failed to achieve full and continuous compliance with SCP objectives to facilitate reunification with [Child;] [a]doption is not a viable option because [Child] is comfortable with PLC rather than adoption [because he] would like to maintain a relationship with his biological family and believes PLC is the best way to do so. [A.W.] is[] an appropriate permanent caregiver[] for [C]hild …. The goal change to [PLC] is in the best interest of [Child] as he has been residing with Mr. and Mrs. W[] since February 10, 2018. Mr. and Mrs. W[] are an appropriate caregiver for [Child] because they have shown that they can provide a stable and loving home for him. [Child] has a strong bond with Mr. and Mrs. W[], and has thrived under their care. Mr. and Mrs. W[] provide for [Child]'s financial, educational, medical, emotional, and spiritual needs.

(Petition for Goal Change to Permanent Legal Custody, 3/02/21, at 6).

On May 11, 2021, the court held a hearing on the petition at which DHS presented the testimony of Child's foster parent, A.W., and CUA APM case manager Eunikue Dutton-Vass.[5] Father testified on his own behalf. All parties were represented by counsel, including Child.

Ms. Dutton-Vass testified that Child and his brother, G.F., had been adjudicated dependent and committed to DHS on September 22, 2016, and had been placed in A.W.'s home since February 10, 2018. (**See** N.T. PLC Hearing, 5/11/21, at 15). Since then, the placement has been continuous and the commitment to DHS has been uninterrupted. (**See id.** at 32). She stated that it was her opinion that it would be in Child's best interest for the court to grant A.W. PLC, with liberal visitation with Father at Child's discretion. (**See id.** at 17, 31).

She explained that DHS ruled out adoption because Child wished to maintain a bond with his biological family. (**Id.** at 16-17). Ms. Dutton-Vass testified that Child knows Father and looks forward to seeing him and is disappointed when Father does not attend a visit or fails to keep a promise. (**See id.** at 33).

_____

[5] Child's siblings' goal change petitions were also addressed at the hearing. G.F.'s goal change petition to PLC with A.W. was also addressed at the hearing. (**See** N.T. Hearing, at 14). The petition was uncontested and the court entered an order granting A.W. permanent legal custody of G.F. (**See id.** at 25).

Reunification was not ruled a permanency goal because of Father's failure to comply with all SCP objectives. She explained that Father's objectives were to adhere to his liberal visits with Child, comply with mental health services and provide a certificate of completion, request a two-bedroom apartment and keep in contact with the CUA. (*See id.* at 29). However, Father had been inconsistent in his visitation with Child due to his travel back and forth to Virginia. (*See id.* at 31). By his own choice, he had not seen Child for the approximately one-and-a-half months prior to the hearing. (*See id.* at 30). He had not stayed in contact with CUA/APM. (*See id.* at 30). Father advised Ms. Dutton-Vass that he had completed mental health treatment at JFK, and that his caseworker was supposed to get his certificate of completion, but Father had failed to provide her with it despite her asking for it for over a year . (*See id.* at 30, 34). She also observed that to her knowledge, Father had not obtained appropriate housing for Child, *i.e.*, a two-bedroom apartment. She had reached out to Father multiple times about it; they had discussed it and he told her he would acquire the appropriate apartment, but he failed to do so. (*See id.* at 30, 34). She characterized Father's compliance with the permanency plan as "minimal." (*See id.* at 31, 34).

Ms. Dutton-Vass testified that Mother agreed with the goal of PLC and that a liberal visitation plan allowed Child to have visits with Mother and Father in the community. (*See id.* at 17, 29). She also opined that Child was bonded

with A.W., who met all his needs and in whose care he was thriving. (***See id.*** at 28, 33). For example, at the time of the hearing, Child was in second grade at Mastery Douglas where his grades were admittedly a little low, but it was hoped that in-person schooling would bring them up. (***See id.*** at 28). He was up to date on his medical and dental care. Ms. Dutton-Vass believed it would be in Child's best interest for the court to grant the PLC petition. (***See id.*** at 17, 29, 32-33).

A.W. testified that PLC had been explained to her and that she is willing to accept PLC of Child. (***See id.*** at 35). She agreed that she would "provide for his physical, emotional, educational, medical and spiritual needs until he reaches twenty-one years of age." (***Id.***).

Father testified that he would like Child to live with him. He stated that his schedule allows him to care for Child and he would provide him with anything he needs. He explained that although he has a one-bedroom apartment, he also has a sofa bed that he would use so his son could use the bed. Although he acknowledged that he travels to Virginia, he testified that he has someone who can care for Child in his absence. He also stated that his home is close to a school. (***See id.*** at 21, 38-39, 41).

Father conceded that he has not completed mental health treatment but stated that he had sought treatment to help him get through his housing and other issues on his own and that it did not have anything to do with the courts. (***Id.*** at 39-42). He did not provide CUA with any documentation about it

because it was not necessary and obtaining the paperwork to provide to CUA "wasn't that important to [him]." (*Id.* at 42). He contended that he wished to continue the treatment but could not do so because of Covid-19. (*See id.* at 40).

Father described his relationship with Child as "very loving" and noted that he has not been able to visit with him due to COVID-19 and because he was no longer driving and does not "walk around a lot of people." (*Id.* at 40-41). Father felt like he had "met the needs where [his] son can spend more time with [him,]" despite missing visits. (*Id.* at 20, 41). He testified that he visited Child on his birthday in March but had not seen him since then. (*See id.* at 41-43).

Father testified that he was aware of Child's IEP and that he went to the school two or three times, which was whenever they called him. He did not remember the name of the school and did not know Child was physically attending school again (presumably after being virtual due to Covid-19). He maintained that he would be able to take Child to school and to his therapy appointments if Child lived with him. (*See id.* at 43-45).

At the conclusion of the hearing, the court granted the PLC petition, stating:

> I'm granting the PLC Petition and awarding permanent legal custody to [Maternal Aunt] based upon the fact that [F]ather, although he says he's involved in [C]hild's life hasn't really been involved. Minimal involvement for four years. [F]ather says he's ready to receive [C]hild, doesn't understand many of the basic information about [C]hild, has not continued to comply with the

goals of [DHS], is in minimal compliance. [C]hild has been out of [Father's] care for four years and [Father]'s not a lot closer to caring for [C]hild now as he was back then.

(*Id.* at 46).

Father timely appealed and filed a contemporaneous statement of errors complained of on appeal. The court has filed an opinion. *See* Pa.R.A.P. 1925.

**II.**

Father argues that the trial court abused its discretion or erred as a matter of law when it changed Child's permanency goal to PLC. (*See* Father's Brief, at 3).[6] He maintains that the order granting DHS's request for permanent legal custody must be vacated because the court did not properly conduct the PLC analysis. (*See* Father's Brief, at 6). Specifically, he argues that (1) the trial court failed to consider the parent-child bond or (2) to either hear from or interview Child. (*See id.* at 6, 13, 16).

---

[6] Our standard of review of this matter is for an abuse of discretion. *See In re K.J.*, 27 A.3d 236, 241 (Pa. Super. 2011). "When reviewing [] a decision[ granting permanent legal custody,] we are bound by the facts as found by the trial court unless they are not supported in the record." *Id.* (citation omitted). "[However], we are not bound by the trial court's inferences, deductions, and conclusions therefrom; we must exercise our independent judgment in reviewing the court's determination[.] … Our scope of review, accordingly, is of the broadest possible nature." *Id.* (citation omitted). "Nevertheless, we accord great weight to the court's fact-finding function because the court is in the best position to observe and rule on the credibility of the parties and the witnesses." *Id.* (citation omitted).

**A.**

We begin by observing that, "upon the filing of a petition by a county

children and youth agency that alleges the dependent child's current

placement is not safe, and the physical, mental, and moral welfare of the child

would best be served if subsidized permanent legal custodianship (PLC) were

granted[,]" the court can consider PLC. ***In re S.H.***, 71 A.3d 973, 978 (Pa.

Super. 2013), *appeal denied*, 80 A.3d 778 (Pa. 2013) (citation omitted).

> … In Pennsylvania, a juvenile court may award [PLC] to a child's
> caretaker pursuant to Section 6351(a)(2.1) of the Juvenile Act.[7]
> This is an arrangement whereby a juvenile court discontinues
> court intervention as well as supervision by a county agency, and
> awards custody of a dependent child, on a permanent basis, to a
> custodian.  **Parental rights are not terminated**.  The custodian
> is typically provided a financial subsidy for the child by the local
> county children and youth agency. …

***Id.*** at 977 (Pa. Super. 2013) (case citation omitted; emphasis added).  The

court must conduct a hearing focused on the best interests of the child and

"to declare the custodian a permanent legal custodian the court must find that

neither reunification nor adoption is best suited to the child's safety, protection

and physical, mental and moral welfare."  ***See id.*** (citing 42 Pa.C.S.

§ 6351(f.1)) (case citation and internal quotation marks omitted).

> At each review hearing concerning a child who has been
> adjudicated dependent and removed from the parental home, the
> trial court must consider:  the continuing necessity for and
> appropriateness of the placement; the extent of compliance with
> the service plan developed for the child; the extent of progress

---

[7] 42 Pa.C.S. §§ 6301-6375.

made towards alleviating the circumstances which necessitated the original placement; the appropriateness and feasibility of the current placement goal for the child; and, a likely date by which the goal for the child might be achieved.

*In re K.J.*, *supra* at 241 (citing citation omitted); *see also* 42 Pa.C.S. § 6351(f). "Once the court makes these findings, it must determine whether reunification, adoption, or placing the child with a legal guardian is best suited to the child's safety, protection, and physical, mental and moral welfare." *Id.* (citations omitted); *see also* 42 Pa.C.S. § 6351(f.1)(4).

The trial court explains that it:

> … made statutory findings that determined that reunification of the Child with his Father was not a viable option because Father has not been involved in [Child]'s life and does not understand much of the basic information about the Child. Father has not complied with FSP goals for reunification. Adoption was also not a viable option because it is the Child's desire to continue a relationship with both Mother and Father. Placing the Child in Subsidized Permanent Legal Custody with his Caregiver, along with his brother is best suited to his safety, protection, and physical, mental and moral welfare pursuant to 42 Pa.C.S.A. § 6351(a)(2.1). Father was awarded visitation at [Child]'s discretion with his biological family. (Order, 5/11/2021).
>
> This award of Custody under the Juvenile Act preserves a parent's right to seek primary custody if it serves the best interests of the child. Father may file an action for any form of physical custody or legal custody pursuant to the Custody Act. This order does not exclude him the right to petition to modify a custody order entered in this dependency proceeding. Section 6351(a)(2.1) states that "The court shall refer issues related to support and continuing visitation by the parent to the section of the court of common pleas that regularly determines support and visitation." The May 11, 2021 Order of Permanent Legal Custody clearly states, "any motion pertaining to, or requesting a change in primary legal custody, shall be titled "Motion to Modify/Vacate the Permanent Legal Custody", and filed at Family Court, Juvenile Branch, 1501 Arch Street, Philadelphia, PA 19102."

- 13 -

(Trial Court Opinion, 6/24/21, at 19).

The foregoing confirms that contrary to Father's claim, the court expressly considered Child's bond with Father, ruling out adoption as a viable permanency option because Child did not want to be adopted so he could maintain a relationship with his Father. (***See id.*** at 16, 19) ("Adoption was also not a viable option because it is the Child's desire to continue a relationship with both Mother and Father.").

We further note that, "[i]n addition to a bond examination, the court can equally emphasize the safety needs of the child [and] should also examine the intangibles such as the love, comfort, security, and stability the child might have with the foster parent." (***See In re K.Z.S.***, 946 A.2d 753, 763 (Pa. Super. 2008).[8] Here, although the court concluded that adoption was not appropriate because of the parent-child bond, it also found that reunification was not appropriate where Child and his sibling wanted to remain together with their foster parent, in whose continuous care they had been for three-and-a-half years, and Father had not completed his SCP objectives, ultimately concluding that PLC was "best suited to [Child's] safety, protection, and physical, mental and moral welfare pursuant to 42 Pa.C.S.A. § 6351(a)(2.1)."

---

[8] Father does not challenge the court's consideration of the other factors. We merely mention them as part of our plenary review.

- 14 -

(Trial Ct. Op., at 19); (**see also** N.T. Hearing, at 17-18). We discern no abuse of discretion.

Ms. Dutton-Voss opined that it would be in Child's best interest to remain in A.W.'s permanent legal custody. She testified that for three-and-a-half years, A.W. had been meeting all the needs of Child and that he has been thriving in her care. A.W. testified that she was willing to accept PLC of Child and that she would continue to meet all his needs. Conversely, Ms. Dutton-Voss testified that despite claiming that he wanted custody of Child, Father was not in compliance with his objectives where he failed to visit regularly with Child because of his out-of-state travel, did not provide court-ordered proof of mental health treatment completion and did not have appropriate housing to care for Child.

Based on the foregoing, we conclude that the court did not abuse its discretion in awarding DHS's petition for permanent legal custody of A.W.

**B.**

Father also claims that the trial court abused its discretion in granting DHS's petition for PLC because Child did not testify and the court did not interview him. (**See** Father's Brief, at 6, 16). However, as observed by DHS, this issue is waived because Father failed to raise this claim either in the trial

court or in his Rule 1925(b) statement.[9]  (**See** DHS's Brief, at 18-19); **see also** Pa.R.A.P. 302(a) ("Issues not raised in the trial court are waived and cannot be raised for the first time on appeal."); Pa.R.A.P. 1925(b)(4)(vii) ("Issues not included in the Statement and/or not raised in accordance with the provisions of this paragraph (b)(4) are waived.").

Moreover, Father's issue would not merit relief.  Pennsylvania Rule of Juvenile Court Procedure 1128 provides, in pertinent part:

> **A. General Rule.** All parties, including the child, shall be present at any proceeding unless the exceptions of paragraph (B) apply.
>
> **B. Exceptions.**
>
> (1) *Absence from Proceedings.* The court may proceed in the absence of a party upon good cause shown except that in no case shall a hearing occur in the absence of a child's attorney.  If a child has a guardian *ad litem* and legal counsel, both attorneys shall be present.
>
> (2) *Exclusion from Proceedings*. A party may be excluded from a proceeding only for good cause shown.  If a party is so excluded, counsel for the party shall be permitted to be present.

Pa.R.J.C.P. 1128(A), (B).

> The Comment to the Rule explains:
>
> In no case is a proceeding to occur in the absence of the child's attorney. …
>
> Requiring the child's attorney to be present pursuant to paragraph (B)(2) protects the child's interest if the proceeding is conducted

---

[9] Although Father reserved the right to supplement his statement of errors, he did not do so.  (**See** Father's Statement of Errors Complained of on Appeal, at 1).

- 16 -

in the child's absence. However, unless good cause is shown by individual circumstances, a child should be present in court. It is important that all children, including infants, appear in court so the court can observe the interaction between the caregiver and child and observe the child's development and health. …

Pa.R.J.C.P. 1128 (Comment).[10]

However, pursuant to Section 6351 of the Juvenile Act, in permanency hearings:

If the court does not consult personally with the child, the court shall ensure that the views of the child regarding the permanency plan have been ascertained to the fullest extent possible and communicated to the court by the guardian *ad litem* under section 6311 (relating to guardian ad litem for child in court proceedings) or, as appropriate to the circumstances of the case by the child's counsel, the court-appointed special advocate or other person as designated by the court.

42 Pa.C.S. § 6351(e).

Here, it is undisputed that Child did not appear at the custody hearing. We agree that, ideally, Child should have been presented to voice his preferences and for the court to observe his interaction with A.W., particularly where he has not ever been in court over the three years he has been in placement. However, his legal advocate was always present, acting on Child's behalf and cross-examining witnesses.

---

[10] The child, guardian or a witness may appear at a proceeding by utilizing advanced communication technology … At a minimum, the child shall appear in person at least every six months unless as otherwise provided by Rule 1128. Pa.R.J.C.P. 1129(A).

In fact, Ms. Dutton-Vass testified that it was Child's preference that he not be adopted because he has a loving relationship with his Father, which he wanted to continue to foster, testimony that certainly was favorable to Father. While Father claims that had Child been present, the court could have observed him interacting with A.W., there was no claim by anyone, including Father and his counsel, that Ms. Dutton-Vass was incorrect in her representation that Child was thriving at A.W.'s home; nor do they allege that in this appeal. Therefore, even if not waived, this issue would not merit relief and we affirm the trial court's order.[11]

Order affirmed.

*Judgment Entered.*

*Joseph D. Seletyn, Esq.*
*Prothonotary*

*Date: 11/1/2021*

---

[11] We also remind Father that the grant of PLC to A.W. does not terminate his parental rights. In fact, the court expressly noted that "Father may file an action for any form of physical custody or legal custody pursuant to the Custody Act. This [PLC] order does not exclude him the right to petition to modify a custody order entered in this dependency proceeding." (Trial Ct. Op., at 19).

- 18 -